I'm here for Shawn Khalifa. I've got the order or a memo from the court saying that neither party believes the issue of exhaustion before the state court regarding the petitioner's federal constitution. Why don't you speak into the microphone. I'm sorry? Speak into the microphone. I'm sorry. I mean raise your voice. I've got the order from October 1st from the court just saying that neither party briefed the issue of exhaustion before the state court regarding the petitioner's federal constitutional right to speedy trial. I was a little confused. Do you need clarification of the order? Yes please because we... It's not clear to us that he adequately raised his Sixth Amendment right to a speedy trial in the state courts and the California appellate courts never addressed the federal issue. They were given the federal issue and the federal... In the appeal court the plaintiff did raise the federal... You know I'm having... I've got my hearing aids on. I've got this here. I'm sorry your honor. I'll try to stay a little closer. Is that better? Project your voice out. You're talking down not out. Yeah. All right. They did quote the or cite the US Supreme Court law federal court about the right to speedy trial. So those issues... To which court do you refer? It was to the appellate court. To which appellate court? The court of appeal or the Supreme Court of the state of California? To the Supreme Court of the state of California. And where was that cited? Your position is that the brief that was forwarded to the California Supreme Court adequately raised the Sixth Amendment claim? Yes your honor. And where was that cited? That's on the the petition for review which was given to the California State Supreme Court. It's on page... The end of page 11 beginning of page 12. They cited Doggett versus the United States. Cited which? It cites to Doggett versus the United States from 1992 and Barker versus Wingo which are two of the seminal cases regarding the Sixth Amendment right to speedy trial. Thank you. Yeah. So your position is that the speedy trial issue was exhausted before the state court? Yes sir. Yes your honor. And what you got were what two postcard denials? From the California Supreme Court yes. And what did they say? I think it just was a one line denial. What? I believe it was a one line denial. I believe it was a raise that they improperly determined the question of law. All right. That's a D1. Okay. Unless I'm mistaken they determined there was no prejudice without looking at the entire analysis for whether or not who caused the delay, how long the delay was. And the basis of no prejudice was that the only prejudice which the plaintiff, pardon me, the petitioner claimed was that the two brothers who put him at the scene of the crime were prosecution witnesses, were no longer available. How was that a prejudice? Well they had testified at the preliminary hearing as to certain facts, certain things they had seen. Two and a half years after the preliminary hearing Mr. Khalifa's co-defendant agreed to a deal in exchange for testifying against him. Once those witnesses were no longer available. They were already in Mexico. At which point Mr. Khalifa's co-defendant made certain claims about Mr. Khalifa's behavior. Which had never been brought up before and some of the things that the two witnesses had said two and a half years earlier indicated that this might not be true. But by the time we went to trial they were gone. These things couldn't have been explored. And at the time of the preliminary hearing, two and a half years prior to his co-defendant making certain accusations, there was no reason for defense attorneys to question the two brothers in detail about some of these things. You're exactly right. This is a really important point, Your Honor. Sean Khalifa was arrested and a year later they held the preliminary hearing. Two and a half years later, I believe it was the very day they started jury determination, his co-defendant agreed to be a witness against him. So there was, we do have the preliminary hearing transcripts, but what we don't have is the ability to look at certain things that they had said at the preliminary hearing and expand on those. At the preliminary hearing there was no reason to. Did you have the opportunity to contact them in Mexico and get a declaration saying that they would expand their testimony in favor of you? No, not at the time. Then how do you know what they're going to say? Well, that's the prejudice. The prejudice is not speculation that they may break well for you. The question is whether you have any proof that they would be favorable to you and that proof being denied you, you had prejudice. But you can't establish prejudice on a hope and a wing. Well, that's true. But in this case, we have at least two instances where we have a pretty, how can I put it, in the right to speedy trial, the prejudice is that the defense was harmed by the delay caused by either the trial court or the prosecution. The analogy is if there's a delay and DNA evidence is lost, you can never get it back. That doesn't work. Yeah, but the delay here was, the only delay which was objected to by Khalifa, your client, was about what, eight months? I believe so. The rest of the time, including after the eight months delay, he stipulated a two-month delay, right? Exactly. So he had delay in a big chunk before, then the delay he objected to, then a small chunk afterwards, the delay he agreed to. How does that all play out as to what the brothers in Mexico would have said that would have been helpful to you? Well, there was one point in the preliminary hearing where one of the brothers was asked when they saw the two older boys who actually killed Mr. Love. And he said, well, we were drinking earlier, and the prosecution interrupted him and said, no, no, no, it was when he was walking down the street just prior to walking into Mr. Love's house. At the time, no one followed up on that. It didn't, there was no reason to. Two and a half years later, it was Mr. Khalifa's co-defendant's testimony that the two young men who actually committed the murder had spent the afternoon with Sean Khalifa. Now we have the testimony from the preliminary hearing. It seems to be that that might not have been true, that Ivan Cos, one of the witnesses, had said that, no, in fact, at least one of the perpetrators was with them drinking. Was that Khalifa? No, one of the other perpetrators. No, one of the boys who actually did it was with them. Another case, the other brother, Eric Castillo, testified. But how does that, I mean, that may be a contradiction as to the actual perpetrators of the murder, but how does that exculpate Khalifa? Well, there was, except for the fact that he was walking by the house, there was no evidence that he was part of this crime until his co-defendant testified that he and Sean Khalifa had met with the older boys prior. They had walked to the crime scene together, which the witnesses said didn't happen, that the two older boys had gone to the door and told Sean Khalifa and his friend to stand guard. How does the delay cause the co-defendant to turn over? That was an issue that was brought up in state court. I do not believe, I did not raise it here, that he was prejudiced by his co-defendant making a deal because I do not believe that's what the federal protections. Mr. Whitehouse, given the fact that we're on AEDPA review, what do we do with the determination by the District Court of Appeal that the testimony of the Castillo brothers was generally consistent with what Gardner, the co-defendant who turned state's evidence, testified to, specifically with regard to observations in and around the house? That's interesting, because the witness testimony was consistent with the fact that Sean Khalifa and his friend walked past the house. According to witnesses, they were 50 yards behind the young man who actually killed Mr. Love. According to the witnesses, they did not interact with the two older boys. According to the witnesses, they did not stand in front of the house, they walked down the street and crossed over to the other side. According to the witnesses, they did not go on the side of the house for 20 minutes. To the extent to which Sean Khalifa was with his friend, they walked down the street, not with the two older boys, and that they walked past the house, that they waited down the street, across the street for 20 minutes, and then went over to the side yard of the victim, and two minutes later ran out. To the extent to which that is what, I mean, that's what the witness said. Well, I guess my concern is, though, that they looked, the District Court of Appeal looked at that testimony that you just recited, and then they concluded the fact that Castillo did not perceive the precise facts perceived by and testified to by Gardner does not mean Castillo's testimony would have led to a better result than that obtained with Gardner's testimony. So it seems to me that what you're asking us to do is to overturn the factual determination by the District Court of Appeal that there was no prejudice from the failure to admit the preliminary hearing testimony of the Castillo brothers because it wouldn't have helped your client. I believe to the extent to which the District Court says that the witness testimony was the same as Mark Gardner's, I believe that that's factually not true. So we have to invoke that provision under AEDPA and declare that by clear and convincing evidence that that factual determination is wrong. Yes, what I pointed out, I tried to make clear in the brief, is that there were several things that Mark Gardner said that nobody else said, including claiming that they met with the old boys prior, that they walked. But the Castillos wouldn't have been able to testify about that. They weren't there. Exactly. So to the extent to which Mark Gardner testified that they were associated, the witness testimony doesn't, of the Castillo brothers, is not the same as Mark Gardner's. Maybe you and I are talking past one another, but as I read that passage out of the court's opinion, what they're saying here is that it wouldn't have made any difference if the jury had heard that testimony read into the record from their preliminary hearing transcript, that the result would have been the same. So therefore, no prejudice. Our position here isn't that Chanclifa was prejudiced because they did not use the preliminary hearing transcripts because they had them. They could have. But isn't prejudice one of the factors that we apply under Barber? Exactly. The prejudice is… So if there is none, then you don't need that factor. No, no, no. I'm sorry, Your Honor. The prejudice is not that the Castillo brothers did not show up at trial and say exactly what they did at the preliminary hearing. The prejudice is that they were gone. They were allowed to leave the jurisdiction so that we couldn't bring them back to trial. So we're back to speculating as to what they might have said had they been live witnesses at trial? My position about the speculation, Your Honor, is that the U.S. Supreme Court's been really clear that you can't speculate. Right. But the case that they used… So what would they have said? We don't know. Well, the case that the U.S. Supreme Court uses for speculation, Your Honor, is a case where a young – well, a defendant was charged and 22 months later arrested and tried. And he claimed that if they had tried me originally, I would have probably got a deal. He had no evidence that that was true. That was pure speculation. The district attorney never made that – gave him any reason to believe that. This gets back to Judge Bea's original question about did you go to Mexico and interview the Castillo brothers? Do we have a declaration from somebody who says here's what the Castillo brothers would have said? No, but that's the difference between prejudice in the context of a speedy trial. The damage that we're looking to prevent is that evidence gets lost and we never get it. Why do you say, Mr. Whitehouse, that the Castillo brothers, had they been made to stay in the United States, would have said anything different than what they said at their preliminary hearing? I believe they would have expanded on it. I don't believe they would have said something different. Why do you not believe they would have constrained themselves and said even less? They could have. They could have said more? They could have said less? We don't know. But isn't the burden of proof of showing that what they would have said would have been helpful to your client and their absence causes prejudice on you? I believe in the right to speedy trial, the prejudice is the possibility. Do you have a case that says if there's a possibility that a witness would have been favorable to a defendant whose trial was delayed, that by itself is sufficient to grant the writ? I believe the U.S. Supreme Court said that the prejudice is the possibility the defense was hampered. Could you give me a cite? I'm sorry. I don't have it with me here. I do have it in my brief. I'll look for that. Thank you very much. Is there anything else? You're way over your time. I'm sorry, Your Honor. Thank you for indulging me. Thank you. Thank you. Thank you. Good morning. I'm Kevin Vienna, California Deputy Attorney General here for Respondent. I would like to begin as well with the question of whether the federal claim was exhausted in the state court. And from the beginning, our office, I have seen this as a close question. In our answer, I would say that we equivocated on the question of exhaustion. That is, we acknowledge the possibility that the district court You mean your answer to the petition for the writ in district court? Yes, Your Honor. All right. We equivocated. That is, we recognized that the specificity of a Sixth Amendment claim in the state court was at least arguable. That is, Mr. Khalifa never said that. I didn't say clearly that my Sixth Amendment right to speedy trial was denied, and so the charges should be dismissed. Mr. Whitehouse cited pages 11 and 12 of the petition for review. Do you have a view as to the sufficiency of that citation? I would agree with Mr. Whitehouse. It's quite clear that both before the court of appeal and before the California Supreme Court, that is, at both levels, as required to exhaust a claim, Mr. Khalifa cited to both Doggett and to Barker v. Wingo. Now, it is also clear that his reference to both of those was directed to the evaluation of prejudice. And prejudice is, in some ways, is a distinct claim of what he did argue most directly, and that is that the trial court had abused its discretion in failing either to sever, or in failing to sever his case from that of the co-defendants in order to proceed to trial quickly. Now, the reason I say that it's a closed question is that exhaustion requires a federal petitioner to have fairly presented to the state court his claim and identify the constitutional basis for the claim. The reason I think that we essentially have resolved that exhaustion did occur and were somewhat equivocal in our statement in the answer is that the state statutory speedy trial right exists to protect both the state and the federal constitutional right as well. That is, I believe both in intent and in practice they are entwined. Well, if you admit that exhaustion did occur, let's move on to the rest of it. Very well, Your Honor. Well, I guess what I would say is this Court could still disagree with me on that, and occasionally this Court has disagreed with me. The question would be, you say equivocation. It causes me to think, well, did you invoke the procedural bar or did you not? It sounds like the answer is no, we didn't. We just sort of waffled. Sadly, I have to agree with you on that, Your Honor. All right. Okay. Thank you for your candor. But I do believe that because the state statutory right is designed to protect the Sixth Amendment right, I think that was in the mind both of the trial court and the courts of appeal. And I spent a good deal of time in my brief, I think, trying to explain why the state court addressed only the prejudice aspect of it, explain what the setup was there, and to say that they were responding to— It seems to me we just apply normal federal habeas review under AEDPA to the determination of the state courts on it. Yes, Your Honor, I agree. And although the court addressed specifically, the state court of appeal addressed specifically only the question of prejudice, I believe that you should view them as having examined all of the claim under Barker v. Wingo and to have considered all four of the factors and to have not remarked on the factors of—much on the factors of cause of delay and the prosecutor's good faith or bad faith because neither of those were argued with any force by Mr. Khalifa in the state court. And I believe they were not argued with much force by Mr. Khalifa in the state court because he has no case to make on them. That is, there is nothing to justify a decision that the prosecutor exercised bad faith in. Well, in terms of the cause of delay, it looked to me like sort of everybody was at fault at various points during the four-year period, and there's only a period of about a total of eight months where Mr. Khalifa could say, look, I asked for a severance and they didn't give me one, and so now we're into the question of prejudice. And I think all the courts have agreed on that timeline quite clearly. But I would add that the prosecutor's contribution to that delay, as the district court properly observed, was approximately five weeks. That is, the remainder of that—I'm sorry. Let me ask you this. I mean, are you suggesting that perhaps it would be a good idea to send this matter back to the district court to decide some of these issues? No, Your Honor. In fact, as I said in my brief, I think the district court addressed all four of the Barker versus Wingo factors extensively, and their review was essentially de novo, which is in essence proper when the state court has not given a reasoned opinion on an issue or on a part of the claim. So the district court's analysis was correct, its approach was correct, and its decision was also correct. It's correct except in one regard. They evaluated the issues of length of delay and cause of delay as neutral, and I think they should have said that the evaluation— Are we talking about the district court? The district court. Why are you saying they? I'm sorry. And I say they because we wind up in—or what I see is two different judges, a magistrate judge and a judge in the district court have done that. You are more precise than me, and I thank you for the correction. So I don't think that there's anything more to be decided in the district court. They very carefully examined the extensive record and expressed a reason why either where the state court expressed its opinion on a Barker versus Wingo factor, that is, for example, was there an assertion of the right to speedy trial or was there prejudice? The state decision was reasonable, and their discussion of the factors of the cause of delay, the reason for delay, also indicates how a fair-minded jurist would have agreed with the state court that there was no violation of the Sixth Amendment right to speedy trial. Finally, the one final issue that I would speak to is the question about whether Khalifa has demonstrated prejudice, and I think he has not demonstrated prejudice for the very reasons that this Court has identified, that is, it is speculation. I would add that it seems quite clear at trial that he had no interest in the testimony of the Casillo brothers because he could have sought to admit their former testimony from the preliminary hearing to the extent he believed it was helpfully inconsistent. Did he object to it? Yes. Successfully. Although I think it is at least, yes, successfully, he and his co-defendants objected to it. The timeline on that is somewhat ambiguous. That is, when they made the objection, I am not sure that Gardner, that Gardner's, what I believe was discovered to be a recorded confession from Gardner, had been discovered by the police. But they did object to it, and then Khalifa didn't seek to overturn that or seek to use that former testimony himself at trial after Gardner emerged as a witness. The question about how much prejudice needs to be shown or what sort of prejudice I think is not perfectly clear. I think it's correct that speculation is not enough, but I would soften that assertion with this. It is also clear from Barker v. Wingo that evidence need not be shown on all four of the Barker v. Wingo factors. And what that says to me is that it is at least conceivable that a petitioner could succeed on a Sixth Amendment speedy trial claim even if there were no prejudice shown. But that would be a circumstance, that's certainly not what we have here. That would be a circumstance where the delay was egregious and perhaps where the prosecutor was shown to have behaved badly. But in a case like this where each of the other three facts, well, we know that at least for a while, there was an assertion of the speedy trial claim, but that is weakened by Khalifa's agreeing to subsequent extension of the trial date. And where no evidence was presented of bad faith on the part of the prosecutor. And where a trial court and the California Court of Appeal were carefully policing what was going on with this case. That is, the trial judge was unhappy and reluctant to grant continuances and concerned with Khalifa's speedy trial rights. In that circumstance, then in order to prevail, there should be a demonstrable showing of prejudice, and we don't have that here. If there are no further questions. Well, Khalifa was, what, 15 years old? He was at the time of arrest, yes, Your Honor. And that delay was, what, about three and a half years overall? Yes, Your Honor. Correct. And by then he was 19, and he consented to about 32 months in there. Correct, Your Honor. And this sentence was 25 years to life. Also correct, Your Honor. And he was just, he was in the back of the house. Yes, he went to the back of the house. He was with another young man, wasn't he? Mr. Gardner, that's the co-defendant who rolled and eventually testified against him. Against him, yeah. And how old was he? I don't know the answer to that question, Your Honor. I don't think he was a juvenile. And so what he did, what Khalifa did, was he looked around and opened some drawers and took a few minor items. Candies, I think. Candy, yeah, candy. And then he knew what was going on in the front of the house. Yes, Your Honor. If they were there, they were beating this man to death. Yes, Your Honor. And then he left. They all ran out. Right? That's correct, although I would say that there was evidence of both a conspiracy to commit the crime, which the jury could have seen that this was a planned conspiracy, and that the role of Gardner and Khalifa was the lesser role of lookout. Well, whatever it was. You know, it's always easy. If they were a lookout, they sure weren't doing their job, were they? They were looking for candy. They chose the Castillo brothers who were impaired, so not terribly bad as lookouts. As surrogate lookouts, is that your theory? Yeah, but that's a pretty severe sentence for a 15-year-old, 25 to life. Huh? Don't dispute that, Your Honor. You remember I mentioned a case earlier? That 15-year-old, somewhere in there, was driving a vehicle when one of the passengers, well, in the passenger seat to the right, passing a rival gang's territory, fired into a group of them, and one of them, the other gang, was severely wounded and then died. So, that young man, his sentence was like 15 years straight, and he got out after 10 because he was so exceptional while he was in custody. And then he went out, went on from there to accomplish some very great things. I'm not going to tell you any more because it would take too long, and I might bring tears to your eyes. So, it seems to me like that sentence is a very, very severe one. Wouldn't you say so? I don't disagree. I talked to him. You know, let me tell you this. I really appreciate your coming here because you're frank and open with us. No BS. There's a problem you tell us, and that's the way it should be. You're a good example, and we appreciate it. Those are things like that that bother me. You know, I've been doing this now since 1965. It's a long time for you, but not for me, you know. So, I see all these things, and it just seems like a kid getting candy and all that at 25 and away. I don't know how he's doing at present. I don't know either, but I'd say the law is evolving and concerned about that. Miller v. Alabama has started a trend in California to review the sentencing of juveniles. That's happening right now. Your concerns are recognized. What's the status of his case? In this case? Yeah. He doesn't qualify under Miller, but he may as the law. I can't say what the outcome will be. What did you say? He doesn't qualify, in my opinion, now under Miller. That is, Miller is limited to life without or the decision involved life without parole sentences for juveniles and said that that cannot be mandatory. But I believe it's fair to say that the California courts have expanded that and are expanding that and are looking at cases where we have the equivalent of life without parole. And are reviewing cases and concerned about whether the constitutional principle in Miller will apply. And I think the trend is that it will apply. Is that being done by the California courts or by the California Probation Authority? By the California courts, Your Honor. And by a risk of habeas corpus? Some habeas corpus and some cases that are still on direct appeal. Well, do you have any idea how many cases there are? I do not, Your Honor. And you know one of the big problems, maybe you'll be Attorney General someday, I'll vote for you, and you've got a University of Virginia tie on, haven't you? I do, Your Honor. He doesn't miss much. My daughter went to the University of Virginia. So did Judge Beeser. He wore that tie. He did. At first I thought it was a Berkeley tie. That's my son's, Your Honor. I thought that was progress. But you know what the problem is, now we have federal habeas. In our system, when a criminal case is filed, it goes to the wheel. It goes to a district judge right at the start. And so that judge handles it right from the beginning. Well, he gets it after the arraignment. And if it goes up on appeal and it comes back, it's still his case. Okay, you got that? So it's with him. As long as he is a district judge, he's got that case. He knows that. Now in the state court, and I was on the Superior Court and Municipal Court, if you're in the criminal court system, the court I was in, Department, I think 119, I would handle the sentencing like 120 or more felonies every month. That's the volume. And if there was a problem and the case went up on appeal and it came back, I wouldn't be in 119 because the case stayed with that courtroom number and the judge would, you know, he would move on to some other courtroom. So the case has stayed with the courtroom, not with the judge. So maybe there's a relationship in the federal system where we rarely, rarely see a federal habeas from a federal judge, but we're inundated with state habeas petitions, thousands of them. And the last time I checked in the central district, I'd say if we had 2,000 habeas petitions filed, state habeas, they may grant one or two in a whole year. But now we have almost more magistrates than we have judges handling this. So we're doing the state's work. And at least in this one, there was an opinion came down from the Court of Appeals. Most of the time they just get postcards. And we end up doing it. And so what I'm telling you is the state system needs to do its work more carefully and have to have fixed responsibility. I've been talking about this for a long time, but it does no good. It's refreshing to have you here. I hope you become attorney general. Not likely, but I like it. Thank you. Thank you, Your Honor. Check up on this kid, would you? Find out where he is in the system. I will. I mean, if you're taking out candy, he's a dumb, stupid kid. Just got him. I don't know. Did he have any prior offenses? I'll find out the answer to those questions in court. I have a citation to the case that Your Honor was asking for. The actual prejudice is normally demonstrated by showing a possibility that the defense was impaired by the loss of exculpatory evidence. And that's citing Doggett at 654. Okay, thank you very much. Thank you. Thank you. Matter is submitted.
judges: Pregerson, Tallman, Bea